**George and Peggy COGHLAN**
**Plaintiffs**

v.

**Dan GLICKMAN, et al.   Defendant**

**No. CIV.A. 3:97–CV–683WS.**

United States District Court,
S.D. Mississippi,
Jackson Division.

March 15, 2001.

George Coghlan, Brookhaven, MS, Pro se.

Peggy Coghlan, Brookhaven, MS, Pro se.

David N. Usry, U.S. Attorney's Office, Jackson, MS, for Dan Glickman, in his capacity as Secretary of the U.S. Dept. of Agriculture, Norris Faust, in his capacity as MS State Executive Director of the Farm Service Agency, defendants.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

In their complaint, plaintiffs herein, George and Peggy Coghlan, husband and wife, seek "judicial review" and "injunctive relief," relative to a finding by the Office of General Counsel, United States Department of Agriculture, that the plaintiffs are ineligible for leaseback/buyback loan servicing programs because, in violation of Farmers Home Administration regula-

tions, plaintiffs sold timber from their Farmers Home Administration mortgaged property. Characterizing this decision as arbitrary and capricious, plaintiffs, in this lawsuit, request actual and compensatory damages in the amount of $250,000.00 and punitive damages in the amount of $500,000.00. Named as defendants are Dan Glickman in his official capacity as Secretary of the United States Department of Agriculture (USDA), and Norris Faust in the official capacity he formerly occupied as the Executive Director of Mississippi's Farm Service Agency (the "FSA"). This lawsuit is now before the court for judicial review of the administrative proceedings which have resulted in the antagonistic position of the parties. Earlier, this court addressed various outstanding motions, clarified the points in issue and outlined the court's intended approach. This court now follows that enunciated approach and hereinafter sets out the facts, the law, an analysis and holding in this lawsuit.

## I. FACTUAL BACKGROUND AND COMPLAINT

Between 1970 and 1992, the plaintiffs obtained a total of 19 loans through the Farmers Home Administration (hereinafter FmHA).[1] According to the defendants,

---

1. The Farmers Home Administration traces its origin to the Resettlement Administration, a New Deal rural rehabilitation agency created by executive order in 1935 to help farm families retain their land despite drought and depression. By passage of the Bankhead–Jones Farm Tenant Act, Congress created a comprehensive program of financial aid to farmers who lacked other sources of credit. The Water Facilities Act of 1937 supplemented this Congressional farm program. These depression loan programs were the beginning of what is now a far-flung undertaking by the United States government to bolster the credit position of practically all farm operations, farm related businesses, and rural towns and communities. *See* Farmers Home Administration, This is FmHA: Short History of Farmers Home Administration 20 (Program Aid No. 973 1980).

In 1938, the developing farm programs were first brought together in a new agency, the Farm Security Administration (FSA), a division within the Department of Agriculture. As the financial assistance programs continued to expand, they were revised and reorganized by the Farmers Home Administration Act of 1946. *See Coleman v. Block,* 580 F.Supp. 194, 196 (D.C.N.D.1984).

Thereafter, Congress passed the Consolidated Farmers Home Administration Act of 1961 (as Title III of the Agricultural Credit Act of

the plaintiffs had a long and contentious history with the local County Supervisor and the FmHA/FSA over these loans and even after the loans were consolidated in 1989, the plaintiffs were unable to make their mortgage payments for a two-year period. At some time between 1992 and 1994, the plaintiffs, who were attempting to obtain additional loans,[2] and who were unable to obtain new liquidity from FmHA via continuing loan service as quickly as they desired, sold timber from their mortgaged property for $13,503.71 to pay current year operating and living expenses. After the FSA learned of and objected to this transaction, the plaintiffs tried to obtain authority to sell timber retroactively. The Office of General Counsel (OGC) for the United States Department of Agriculture (USDA) denied this request for relief on the ground that relief which was contrary to FmHA regulations could not be granted. As will be shown in greater detail below, this matter was appealed by the plaintiffs to the National Appeals Division (NAD), and the OGC's decision was remanded for further consideration; however, the hearing officer rendered the decision with the qualification that the hearing officer's decision was not final, and the FSA would be permitted to appeal the decision to the Director of NAD. On appeal the OGC's decision was restored, and the plaintiffs' request for continuing loan service was denied on the ground that they had acted in violation of their contractual obligation and in violation of the applicable regulations when they had sold the timber in question.

■ Over two years passed before the plaintiffs brought the instant lawsuit. In this lawsuit, plaintiffs accuse the defendants of violating the plaintiffs' due process rights under the Fifth Amendment to the United States Constitution[3] when they

1961). The Act, in response to the "increase in farming technology" and the "tremendous differences in the credit needs of farmers," was designed as "a consolidation and modernization of the Secretary's authority to make available to eligible farmers who cannot obtain credit elsewhere direct and insured loans necessary to finance their acquisition, improvement and operation of farms." Thus, the 1961 Act placed under one more modern roof the already existing authority of the Secretary to loan money for three purposes—real estate acquisitions and improvement (Subtitle A), operating expenses (Subtitle B) and emergencies (Subtitle C). *See Curry v. Block,* 541 F.Supp. 506, 510 (D.C.Ga.1982).

2. Exhibit 9 of the plaintiffs' complaint is a letter wherein the plaintiffs lamented their inability to get additional loans after suffering a soybean crop failure in 1990. The letter acknowledges that the plaintiffs were required to submit a new application and plan for their proposed dairy operation before any new loan would be considered. A farm and home plan means any farm planning and/or record keeping system acceptable to the loan approval official. Title 7 C.F.R. § 1945. 154. Usually, the primary loan official is the County Supervisor who is responsible for making a preliminary determination as to whether a loan should be made on the farm. Title 7 C.F.R. § 1943.24. The applicant or borrower will submit a form such as the FmHA 431–1, "Long–Time Farm and Home Plan." The plan reflects long-time aims and objectives and will be completed by each applicant or borrower engaged in farming who is receiving a loan when necessary major adjustments or improvements will not be completed during one crop year. Title 7 C.F.R. § 1924.57.

3. "An FmHA loan, once made, creates a statutory entitlement and a property interest protected by the due process clause of the Fifth Amendment." *Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970); *United States v. Henderson,* 707 F.2d 853, 857 (5th Cir.1983); *McCachren v. Department of Agriculture,* 599 F.2d 655, 656 (5th Cir.1979); *United States v. White,* 429 F.Supp. 1245 (N.D.Miss.1977). To properly observe a borrower's due process rights, the FmHA is required to issue regulations providing borrowers whose assistance is reduced, terminated or not renewed with written notice of the reason for the action and an opportunity to appeal. When the FmHA has promulgated regulations in response to this

had refused the plaintiffs continuing loan service. According to the defendants, the plaintiffs had acted in bad faith when they had cut and sold timber situated on property mortgaged to the United States without written consent. Claiming that they have suffered emotional distress resulting directly from the defendants' administrative actions and decisions, plaintiffs contend that they were unaware of the FmHA's prohibition against cutting timber, and that the FSA used this incident as simply an excuse to deprive them of their rights under Fifth Amendment.

In sum, plaintiffs contend that merely cutting timber, even if it were in violation of the plaintiff's agreements with FmHA and contrary to the applicable regulations, was not an act sufficient to deny the plaintiffs' request for continuing loan service because the plaintiffs did not act in bad faith.

## II.  *Earlier Court Proceedings*

As a preliminary matter, this court took up the motion of the defendants to dismiss

the plaintiffs' complaint insofar as it purported to assert a constitutional tort claim. Defendants filed their motions pursuant to Rule 12(b)(1) and (6) [4] of the Federal Rules of Civil Procedure or, alternately, for summary judgment pursuant to Rule 56(b) and (c),[5] Federal Rules of Civil Procedure.

This court found that it was authorized under the Administrative Procedures Act (the "APA"), Title 5 U.S.C. § 701 *et seq.*, to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *See* Title 5 U.S.C. § 706. This court also noted that its scope of judicial review of federal agency decisions is narrow, *see Bankruptcy Estate of United Shipping Co. v. General Mills*, 34 F.3d 1383 (8th Cir.1994), and that a federal agency's action ordinarily will be set aside "only if it is arbitrary, capricious or an abuse of discretion, or otherwise not in accordance with the law or procedure." *Id.*, citing Title 5 U.S.C. § 706(2)(A), (D).[6]

---

mandate and the notice that the FmHA uses complies with those regulations, there is no violation of due process. *See Boyd v. U.S.*, 861 F.2d 106, 109 (5th Cir.1988).

4.  Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure provides that "[e]very defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third party claim, shall be asserted in the responsive pleading thereto if one is required", except that the following defenses may at the option of the pleader be made by motion:

    (1) lack of subject matter jurisdiction;
    (6) failure to state a claim upon which relief can be granted, ...

5.  Rule 56(b) and (c), Federal Rules of Civil Procedure, provides:

    **(b) For Defending Party.**  A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a

summary judgment in the party's favor as to all or any part thereof.

    **(c) Motion and Proceedings Thereon.** The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

6.  The APA, Title 5 U.S.C. § 706(2), allows courts to set aside agency actions, findings, and conclusions found to be:

    "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
    (B) contrary to constitutional right, power, privilege, or immunity;
    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

This court further found that, when suing the Secretary of Agriculture and/or the USDA, Title 7 U.S.C. § 6912(e) [7] explicitly requires that a person exhaust all administrative appeal procedures established by the Secretary of Agriculture or required by law before the person may bring an action in a court of competent jurisdiction against the Department of Agriculture. As this court then noted, Title 7 U.S.C. § 6999 [8] provides that a decision of the National Appeals Division (NAD) on appeal from the FSA is considered a final agency action under the APA. Therefore, from the documents submitted by the parties, this court concluded that the plaintiffs simply sought to appeal the OGC's denial of their requested continuing loan service and the NAD's reinstatement of the adverse OGC's decision.

Construing the plaintiffs' complaint as an appeal of the NAD decision, this court

> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."
> The Supreme Court interpreted this statute in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 822–25, 28 L.Ed.2d 136 (1971), stating that review under the substantial evidence test is proper only when agency action is taken pursuant to a rulemaking provision of the APA itself, or when it is based on a public adjudicatory hearing. *Id.*, 91 S.Ct. at 822–23. The FmHA/FSA actions in the instant case fall into neither of these categories. *Vieux Carre Property Owners, Residents & Associates, Inc. v. Brown*, 875 F.2d 453, 460–61 (5th Cir.1989).

7. Title 7 U.S.C. § 6912(e) provides in pertinent part that "a person shall exhaust all administrative appeal procedures established by the Secretary [of Agriculture] or required by law before the person may bring an action in a court of competent jurisdiction against ... the Secretary."

then dismissed plaintiffs' complaint insofar as it may have sought to assert a constitutional tort claim.

Additionally, this court held that it lacked jurisdiction to hear plaintiffs' alleged tort claims. A tort claim against the United States will be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented. *Flory v. United States*, 138 F.3d 157, 159 (5th Cir.1998). In this case, plaintiffs have failed to show that they ever raised a constitutional tort claim either against the United States, or its representative Dan Glickman, or the USDA, by presenting a claim to the appropriate agency [9] and ob-

8. Title 7 U.S.C. § 6999 states that "[a] final determination of the Division shall be reviewable and enforceable by any United States district court of competent jurisdiction in accordance with chapter 7 of title 5." The term "Division" is defined in the same chapter of Title 7 as "The National Appeals Division established by this chapter." Title 7 U.S.C. § 6991(6).

9. Furnishing notice of a tort claim is a jurisdictional prerequisite to filing suit for such claims in federal court under the FTCA. A claimant gives proper notice within the meaning of § 2675(a) only when the agency obtains sufficient written information to begin investigating and the claimant places a value on his claim. No particular method of giving notice is required. *Williams v. United States*, 693 F.2d 555, 557 (5th Cir.1982); *Crow v. United States*, 631 F.2d 28, 30 (5th Cir.1980). However, the usual method is by filing a Standard Form 95 with the agency. In the instant case, there is no showing that the plaintiffs have given the agency notice of their tort claims and obtained denial of the claims in writing.

taining denial of that claim in writing by registered or certified mail. This, as earlier stated, is a prerequisite to this court's jurisdiction over the plaintiffs' tort claims. Inasmuch as this prerequisite was not satisfied, this court dismissed the plaintiffs' complaint on the additional ground that any such claim now would be time barred.

### III. *Review Of Administrative Proceedings*

Now, this case is before the court for review of the administrative proceedings and administrative actions taken in the process of denying the plaintiffs continued loan servicing based on the OGC's finding of bad faith by the plaintiffs in carrying out their obligations under the terms of their loan. The sole issue to be determined by this court is whether the federal agency's decision to cease the plaintiffs' continuing loan service due to the plaintiffs' alleged bad faith was arbitrary, capricious or an abuse of discretion, or otherwise not in accordance with the law or procedure.

As previously noted, the plaintiffs received a total of nineteen loans from the FSA through FmHA between May 11, 1970, and May 19, 1992. Eleven of the promissory notes pertaining to these loans had been renewed or reamortized at the time this dispute arose.[10] At all times that these loans were being serviced, the plaintiffs agreed to be bound by all present and future FmHA regulations. The original promissory note executed by the plaintiffs on June 10, 1970, promised to pay the FmHA. The deed of trust executed by the plaintiffs on that same date provides that it is "subject to the present regulations of

the Farmers Home Administration, and to its future regulations not inconsistent with the express provisions hereof." Thus, the plaintiffs clearly obligated themselves to be governed by FmHA regulations.

The 1970 deed of trust signed by the plaintiffs, entitled "Real Estate Deed of Trust for Mississippi," contains twenty-three covenants and agreements. Covenant 9 states in pertinent part that the borrower will not "cause or permit waste, lessening or impairing of the security covered hereby, *or,* without the written consent of the Government, cut remove, or lease any timber, gravel, oil, gas, coal, or other minerals except as may be necessary for ordinary domestic purposes." (Emphasis added). Thus, as security for the plaintiffs' real estate loan, they mortgaged to the FmHA all timber, gravel, oil, gas, coal, or other minerals on their property. Moreover, the plaintiffs obligated themselves to a contractual duty, based on the deed of trust, not to lease, assign, sell, transfer or encumber property mortgaged to the United States.

In 1971, the FmHA amended a previously existing regulation to provide that "[i]n all FHA mortgages the borrower expressly agrees not to engage, without prior consent, in certain specified transactions, including the cutting or removal of timber, or mining or removal of gravel, oil, gas, coal, or other minerals, aside from small amounts used by the borrower for ordinary domestic purposes." Title 7 C.F.R. § 1872.3(a) (1971). Inasmuch as the plaintiffs had agreed to be bound by all present and future FmHA regulations, they clearly were bound by this provision.

---

**10.** Congress has empowered the FmHA with a series of loan restructuring tools to further the Act's goals. The FmHA may: (1) consolidate, reschedule, or reamortize the farmer's loans; (2) reduce the interest rate on the loans; or (3) restructure the loans including deferral or writing-down the principal or accumulated interest charges. Title 7 C.F.R. § 1951.906.

Over the period of years the plaintiffs received continuing mortgage service through FmHA, they signed acknowledgments stating that they had been advised and fully understood that selling secured property without the express consent of the FmHA Supervisor was prohibited. Each of the plaintiffs signed these handwritten acknowledgments on March 8, 1982; on December 21, 1982; and on September 1, 1983.

When the plaintiffs' loans were restructured on June 21, 1989, a new deed of trust containing the same provisions as previously referenced was executed by the plaintiffs. The plaintiffs again agreed to be bound by the present and future regulations of the FmHA. In 1989, Title 7 C.F.R. § 1965.13 provided in pertinent part that, "[i]n all FmHA mortgages . . ., the borrower has agreed not to sell, transfer, assign, mortgage, or otherwise encumber the security or any portion of or interest in it without the prior written consent of the mortgagee." Thus, no security or collateral of any sort could be sold without written consent from the FSA.

At some time between 1993 and 1994, the plaintiffs made a unilateral decision to sell the mortgaged timber on their property. At this time, they were delinquent in their payments to FmHA and had not succeeded in getting another extension. They could have requested permission to sell the timber by filing Form 465–1 (Request for Subordination, Release or Consent) from the FmHA; instead, the plaintiffs carried out the prohibited transaction and applied the proceeds to current operating year expenses and living expenses. Title 7 C.F.R. § 1965.13(f)(4)(ii)(B) provides that "[p]roceeds will not be used to pay current crop/operating year family living and/or operating expenses, as developed in the Annual Plan in accordance with § 1924.56 of Subpart B of Part 1924 of this chapter." Thus, the plaintiffs not only engaged in a prohibited transaction, but they placed the proceeds of that transaction to a prohibited use.

On November 7, 1994, the OGC of USDA reviewed a memorandum from the FSA concerning the timber sale and found substantial evidence supporting the charge that the plaintiffs had committed conversion and waste, and had not acted in good faith in their dealings with the FmHA as required by Title 7 C.F.R. § 1951.909(c)(2).[11] The finding that the plaintiffs had not acted in good faith was based on the plaintiffs' sale of timber mortgaged to the United States for $13,503.71 and the prohibited use of the proceeds to pay current year family living and farm operating expenses. The plaintiffs' request to have the timber sale approved retroactively was denied, as was their request for continuing loan service.

---

11. Section 1951.909(c)(2) provides that "[t]he County Supervisor or approval official authorized by § 1951.903(b) of this subpart must find that the borrower who has applied for Primary Loan Service Programs meets all of the following requirements:

(2) The borrower has acted in good faith as defined in § 1951.906 of this subpart.

Section 1951.606 provides in pertinent part that '[a] borrower is considered to have acted in "good faith" if the borrower has demonstrated "honesty" and "sincerity" in carrying out the agreements set forth on Form FmHA 1962–1, "Agreement for the Use of Proceeds/Release of Chattel Security," and any other written agreements made with FmHA. Findings of a lack of good faith will be based on violations within the borrower's control'. These actions will demonstrate the borrower's intent to violate written agreements with FmHA. All lack of good faith determinations will be adequately documented in the case file. In addition, FmHA must substantiate any allegations of fraud, waste, or conversion with a written legal opinion by the Office of the General Counsel (OGC) when such allegations are used to deny a servicing request".

Furthermore, the OGC concluded that in light of Section 1965.13(f)(4)(ii)(B), and its provision that proceeds cannot be used to pay a borrower's current year operating and living expenses, the decision to deny retroactive approval, said the OGC, was a non-discretionary decision and not appealable.[12] Nevertheless, the plaintiffs appealed on the issue of non-appealability.

The NAD upheld the OGC's finding that the decision could not be appealed because it was a non-discretionary finding under Title 7 C.F.R. § 1900.55(a) (see footnote 11). Resultantly, the plaintiffs failed to qualify for continuing loan service under Title 7 C.F.R. § 1951.909(c)(2) because they had not acted in good faith in their dealings with FmHA. FSA informed the plaintiffs by notices dated February 9, 1995, of its intent to accelerate the plaintiffs' loan account. The plaintiffs then appealed the denial of their request for loan servicing to the NAD.

On June 20, 1995, a hearing officer for NAD remanded the OGC's decision to deny loan servicing for reconsideration of the OGC's finding that the plaintiffs failed to act in good faith. The hearing officer found: (1) that the OGC did not take into account that a previous appeal decision relating to a disaster loan in 1991 was never implemented by FmHA, and that this forced the plaintiffs to sell their timber; (2) that the FmHA failed to tell the OGC that the timber had been appraised as valueless in 1992; and (3) that the plaintiffs met the requirements of Paragraph 9 of the deed of trust when they reported that they had used the proceeds of the sale for current year operating and living expenses. The hearing officer noted that this decision was not final and could

be reviewed by the Director of NAD. The FmHA requested a review.

On July 19, 1995, the Director of NAD rejected the hearing officer's remand order and reinstated the finding of the OGC. First, the Director noted that Title 7 C.F.R. § 1965.13(f)(4)(B) prohibited the use of proceeds from the sale of mortgaged property for current year operating expenses and living expenses and made no "extenuating circumstances" exception to this prohibition. The Director rejected the hearing officer's suggestion that the FmHA had not dealt fairly with the plaintiffs, finding no support for this contention in any of the regulations or in any of the promissory notes or deeds of trust covering the twenty-two year history of the plaintiffs' dealings with the FmHA.

Next, the Director ruled that the 1992 appraisal of the timber as valueless was no longer relevant in view of the $13,503.71 price obtained by the plaintiffs. The prior appraisal, said the Director, did not have to be considered by the OGC since it was only an estimate and not a true market price.

Finally, the Director rejected the hearing officer's finding that the plaintiffs had complied with Paragraph 9 of the deed of trust by accounting for the use of the sales proceeds. As the Director noted, the use to which the proceeds were placed was prohibited by Title 7 C.F.R. § 1965.13(f)(4)(B).

The plaintiffs objected to the Director's review, contending that they had not been properly notified of the request for his review of the hearing officer's findings. Plaintiffs said they would have submitted additional evidence had they been notified.

---

**12.** Title 7 C.F.R. § 1900.55(a) provides in pertinent part that "[t]he National Appeals Staff and its officers do not, however, have the authority to change or waive applicable laws or regulations. Program administrative decisions based on clear and objective statutory or regulatory requirements are therefore not appealable."

Without belaboring the issue of notice given the plaintiffs, the Director simply reopened the case and permitted the plaintiffs to submit the additional evidence. The Director considered the plaintiff's additional evidence, and then adhered to his prior decision. Two years later, this lawsuit was filed.

## IV. *Applicable Law*

### A. Policy

■ Under Title 7 C.F.R. § 1951.2, borrowers are expected to pay their debts to the FmHA in accordance with their agreements and ability to pay. Further, they will be encouraged to pay ahead of schedule, consistent with sound financial management. When borrowers have acted in good faith and have exercised due diligence in an effort to pay their indebtedness but cannot pay on schedule because of circumstances beyond their control, servicing actions will be consistent with the best interests of the borrower and the Government. *United States v. White*, 429 F.Supp. 1245, 1252 (N.D.Miss.1977). FmHA has the responsibility to service the real estate in a manner which will accomplish both the loan objectives as well as protect the government's financial interest. *Id.*, citing Title 7 C.F.R. § 1872.1(b). In *White*, the court noted that, "(t)o accomplish these purposes, the real estate security will be serviced in accordance with the security instruments and any related agreements ... so long as the borrower has reasonable prospects for accomplishing the loan objective, continues to make payments on the loan in accordance with his ability, properly maintains and accounts for the security, and otherwise meets the loan obligation in a satisfactory manner." *Id.* (emphasis added).

### B. The Standard of Review

■ Section 706(2)(A) of the APA provides that the reviewing court shall—"(2)

hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." Thus, the appropriate standard of review of agency action is whether the action was arbitrary and capricious. *Sierra Club v. Glickman*, 67 F.3d 90, 96 (5th Cir.1995) (applying the arbitrary and capricious standard of § 706(2)(A) to a ruling under the Endangered Species Act). While the APA also provides for a de novo standard of review under Title 5 U.S.C. § 706(2)(F), de novo review is authorized only when the action is adjudicatory in nature and the agency fact finding procedures are inadequate. *Id.* The fact finding process in the instant case has been more than adequate. So, the arbitrary and capricious standard of § 706(2)(A) applies in the instant case.

■ This standard of review is narrow, and a federal court is not to substitute its judgment for that of the agency when the agency has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, this court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Matter of Bell Petroleum Services, Inc.*, 3 F.3d 889, 905 (5th Cir.1993), citing *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). Normally, an agency's action is held to be arbitrary and capricious when it relies on factors Congress did not want considered, or utterly fails to analyze an important aspect of the problem, or offers an explanation contrary to the evidence before it, or its explanation is so implausible that it cannot be ascribed

to differing views or agency expertise. *Motor Vehicle v. State Farm Mut.*, 103 S.Ct. at 2867; and *Wilson v. U.S. Dept. of Agriculture*, 991 F.2d 1211, 1215 (5th Cir. 1993).

## C. *Analysis*

■■■ As noted previously, the plaintiffs do not deny that they cut the timber in question and sold it to meet some of their expenses. Plaintiffs argue that, notwithstanding their actions, they still are entitled to have continuing loan service because they did not act in bad faith. Plaintiffs submit no authority supporting this assertion. Instead, they refer to a letter written after the timber sale was discovered wherein they claim that they did not know they could not sell the timber.

Additionally, while the plaintiffs insist that they have not acted in bad faith, they also contended in oral argument before this court that the cutting and removal of timber actually enhanced the value of the plaintiffs' property and did not constitute waste or conversion in violation of the applicable regulations.

■■■ This court is not persuaded by plaintiffs' arguments. First, the plaintiffs cannot be heard to assert that they were unaware of any prohibition against selling timber or any other property which served as collateral for their FmHA loans. The "generally prevailing law" is that "one is presumed to have read a contract (or any other document) that one signs." *See In Re Cajun Electric Power Cooperative, Inc.*, 791 F.2d 353, 359 (5th Cir.1986). Absent fraud or incapacity, one is presumed to know the contents of a document and has an obligation to protect one's self by reading documents prior to signing. *See Boggan v. Data Systems Network Corp.*, 969 F.2d 149, 153 (5th Cir.1992). *See also U.S. Fire Insurance Company v. Coggins*,

195 So.2d 482, 487 (Miss.1967) ( [one] is presumed to have read and understood the instrument to which he affixed his signature). The plaintiffs signed at least three documents saying they understood that they may not sell secured property without the consent of the FmHA supervisor. The plaintiffs also signed deeds of trust specifically prohibiting the cutting or removal of timber from the mortgaged property without the consent of FmHA. The plaintiffs signed promissory notes and deeds of trust agreeing to abide by present and future FmHA regulations, one of which prohibited the cutting and removal of timber without prior consent, 7 C.F.R. § 1872.3(a) (1971); and another which provided that "in all FmHA mortgages . . . the borrower has agreed not to sell, transfer, assign, mortgage, or otherwise encumber the security or any portion of or interest in it without the prior written consent of the mortgagee". Furthermore, . . . [i]n all FmHA mortgages the borrower expressly agrees not to engage, without prior consent, in certain specified transactions, including the cutting or removal of timber, or mining or removal of gravel, oil, gas, coal, or other minerals, except small amounts used by the borrower for ordinary domestic purposes. Title 7 C.F.R. § 1965.13 (1990).

Secondly, the plaintiffs did not exercise due diligence in an effort to pay their indebtedness when they unilaterally determined that they should sell their timber. The plaintiffs did not submit form 465–1, or make any other form of inquiry regarding the legitimacy of their assumption that selling timber was not prohibited.

Thirdly, the plaintiffs' contention that the value of the mortgaged property was actually enhanced by removing the timber is without merit. Although the authority on this point is scarce, this very argument was rejected in *Flint v. United States*

*Department of Agriculture*, 39 F.Supp.2d 418 (D.Vt.1997), *aff'd*, 172 F.3d 37, 1999 WL 65143 (2nd Cir.1999), a case submitted by the defendants after oral argument to this court. In *Flint*, the plaintiffs, owners of the farm in question, had obtained FmHA loans and had failed to make mortgage payments. When the FmHA denied further loan servicing and began to foreclose, the plaintiffs sold some timber from the property to pay expenses. The FSA determined that the plaintiffs had acted in bad faith by cutting FSA timber, thereby making them ineligible for leaseback/buyback loan servicing program. The plaintiffs appealed the decision, eventually reaching the federal district court which held that the FSA decision had not been arbitrary and capricious. Even if the property may have benefitted from cutting timber, said the district court, the former farm owners knowingly committed waste or conversion. The District Court stated further that:

> The OGC determined that the Flints had acted in bad faith by cutting FSA timber. The OGC had information that the value of the timber was approximately $4,900 and that the Flints claimed cutting actually improved value of the property. Even if the OGC did not know that the actual value was less because of the facts alleged by the Flints, the decision was not arbitrary and capricious.
>
> Although the information the Flints offered tends to minimize the extent of the waste or conversion, it is undisputed that they knowingly committed waste or conversion. The applicable regulations do not contain a de minimis exception. In other words, the Flints' evidence goes to the quantum of damages, but does nothing to rebut the finding that the Flints committed acts within their control which violated their agreement. They knowingly converted property

which belonged to the FSA. Although the decision of the Office of General Counsel may not have been informed by the Flint's claim that the FSA-owned timber amounted to less than FSA originally estimated, there was sufficient basis to find the requisite bad faith.

*Flint*, 39 F.Supp.2d at 425.

As noted above, the plaintiffs are hard pressed to claim ignorance when they signed several documents providing that timber would not be cut and secured property would not be sold without FmHA's consent. The plaintiffs failed to exercise due diligence when they proceeded to engage in the prohibited transaction without asking FmHA for advice on the matter, or by seeking permission to sell the timber by submitting Form 465–1. Finally, it is not lost on this court that the plaintiffs' claim before the NAD hearing officer that they were forced to sell their timber is a tacit admission that they acted more out of frustration with the loan process than out of ignorance of their responsibilities. Therefore, for the reasons stated, this court is unpersuaded by the plaintiffs' claim that they were ignorant of their responsibility to seek permission prior to cutting, removing and selling their timber.

## V. CONCLUSION

This court is persuaded from the record, the applicable regulations, and the oral arguments presented by counsel that the finding by the USDA's Office of General Counsel should remain undisturbed, that said finding was not arbitrary, capricious or an abuse of discretion. Title 5 U.S.C. § 706(2)(A)(D). More pointedly, this court is persuaded that the plaintiffs did not act in good faith in their dealings with the FmHA when they chose to cut their mortgaged timber, sell it, and use the proceeds for current year operating and living ex-

penses. Therefore, this court adopts and affirms the decision of the Director of the National Appeals Division, finds for the defendants and dismisses this lawsuit with prejudice. This court will enter a separate judgment in accordance with the local rules.